[No appeal was taken from this order.]

———

LEVI L. TAYMON
vs.
JOHN MITCHELL ET AL.      } DECEMBER TERM, 1849.

———

[WARRANTY—JURISDICTION.]

———

THOUGH the seller of a chattel of which he has the possession, warrants the title, he is not bound to answer for the quality, unless he expressly warrants the goods to be sound and good, or unless he makes a fraudulent misrepresentation, or uses some fraudulent concealment concerning them, which amounts to a warranty in law.

An assertion respecting an article, must be positive and unequivocal, and one on which the buyer places reliance, in order to amount to a warranty. And if the vendee has an opportunity of examining the article, the vendor is not

liable for any latent defect, without fraud or an express warranty, or such a direct representation as is tantamount to it.

Every mere false assertion of value, when no warranty is intended, will not constitute a ground of relief to the purchaser. If the assertion is a mere matter of opinion, in which parties may differ, or if the seller indulge in the common language of puffing, it will not amount to a warranty.

But, if a party undertakes to make a direct representation of a fact, even though he be mistaken as to the fact, if the other party is induced to act upon such representation, equity will relieve against the act, equally as if it had been a wilful and false assertion, for the injury is the same.

Though the means of correct information be equally open to both parties, yet, if either of them does, or says any thing, tending to impose upon the other, and he is imposed upon to his injury, the contract will not be allowed to stand.

In the case of a breach of warranty, the vendee may sue upon it, without returning the goods, or rescind the contract by returning them, or the offer to return them in a reasonable time, so that the seller is placed in *statu quo* and sue for, and recover back, the purchase money, in an action for money had and received.

What is a reasonable time, within which the purchaser must rescind the contract, by a return of, or an offer to return, the thing purchased, does not appear to be stated in the books. The time, however, is to be computed from the period when the unsoundness is discovered, and not from the date of the contract.

An offer to return negroes found to be unsound, made within a month after the sale, and as soon as their unsoundness was discovered, was held to be within a reasonable time.

An offer to return the chattels within a reasonable time, is equivalent in its effect upon the remedy, to an offer accepted by the seller.

In a case of misrepresentation of facts, whether made with a knowledge of their untruth, and with intent to defraud, or made inadvertently by mutual mistake of parties, or by mistake of either of them, if the other has been prejudiced thereby, a court of equity has jurisdiction, and will set aside the contract and declare it a nullity.

A court of equity has concurrent jurisdiction with courts of law, in all cases of fraud and damage, and it makes no difference, that the sale sought to be rescinded on the ground of fraud, was a sale of personal property.

———

[The bill was filed in this case on the 3d of October, 1848, to vacate a sale of negroes made by the administrator of James Mitchell, deceased, to the complainant, on or about the 1st of May in that year.

The bill charged the defendants with having made fraudulent misrepresentations of the value and condition of the negroes; they having stated that they were appraised in the inventory at twelve hundred dollars, when they were in fact only appraised

42*

at seven hundred and fifty dollars; and that they were of sound and healthful constitutions, when they were radically and permanently diseased. The complainant stated, that the negroes had been of very little service to him, requiring frequent care and medical attendance, and that one of them, an infant, died before the bill was filed; and that as soon as he ascertained their unhealthy condition, which was about a month after the sale, he applied, without success, to the defendants to take them back, and to return the securities given for the payment of the purchase money, consisting of certain single bills by him assigned to them.

The bill prayed that the sale might be vacated as fraudulent, and the administrators restrained by injunction from assigning or collecting, and the makers from paying, the single bills given by the complainant for the purchase money; which injunction was granted by the Chancellor.

The answer denied most of the averments of the bill, and testimony was taken under a commission, the effect of which is stated by the Chancellor; who, after hearing the arguments of counsel, delivered the following opinion:]

THE CHANCELLOR:

The case has been fully and very well discussed at the bar; and the court has bestowed upon it all the reflection which its importance and the considerations connected with it require.

That the negroes were diseased prior to, and at the time of the sale, and since; and that the price paid for them greatly exceeded their value, has, I think, been incontestibly established by the proof. And it is also clearly shown, that the complainant purchased them under the erroneous impression that they were sound and healthy negroes; the price being a full one for slaves of that description.

And hence, in my judgment, it follows, that justice requires the recision of the contract of purchase, unless it appears that the complainant, by some act of commission or omission on his part, has forfeited his title to relief; or unless it can be shown, that blindly relying upon his own judgment, he made

the purchase without respect to, or confiding in, the statements and representations made to him of their condition and value, prior to, and at the time of the purchase.

The rule is, that though the seller of a chattel, of which he has the possession, is ordinarily understood to warrant the title, he is not bound to answer for the *quality*, unless under special circumstances ; unless he expressly warrants the goods to be sound and good, or unless he makes a fraudulent representation, or uses some fraudulent concealments concerning them, which amounts to a warranty in law. 2 *Kent's Com.*, 478.

It is not meant to be asserted, that every mere false assertion of value, when no warranty is intended, will be a ground to relieve a purchaser. If the assertion is a mere matter of opinion, in which parties may differ—or if the seller indulge in the common language of puffing, it will not amount to a warranty. For, as expressed in the common maxim, *simplex commendatio non obligat*. According to Mr. Chancellor Kent, "an assertion respecting an article must be positive and unequivocal, and one on which the buyer places reliance, in order to amount to a warranty. And if the vendee has an opportunity of examining the article, the vendor is not answerable for any latent defect, without fraud, or an express warranty, or such a direct representation as is tantamount to it." 2 *Kent's Com.*, 485.

But if a party undertakes to make a direct representation of a fact—even though he be mistaken as to the fact—if the other party is induced to act upon such representation, equity will relieve against the act equally as if it had been a wilful and false assertion—for the injury is the same. *McFerran vs. Taylor and Massie*, 3 *Cranch*, 270.

As remarked by Chief Justice Marshall, in delivering the opinion of the court in that case, "he who sells property on a description given by himself, is bound to make good that description ; and if it be untrue in a material point, though the variance be occasioned by mistake, he must still remain liable for that variance.'

The Court of Appeals of this state in the case of *Joyce and Wife* vs. *Taylor*, 6 *G. & J.*, 64, said "that if a party undertakes to make a statement of facts as true, without a knowledge of their truth or falsehood, and they operate to the deception of the other party, and thereby induce him to do what he would not otherwise do, it will be avoided. The *gist* of the inquiry being, not whether the party making the statement *knew* it to be false, but whether the statement made as true, was believed to be true ; and, therefore, if false, deceived the other party to whom it was made."

These principles relieve the court in this case from the necessity, always an unpleasant one, of deciding whether the representations made to the complainant in regard to the appraisement of these slaves, and their condition of bodily health, were wilful and false assertions, or not. That such representations were made, and that they were untrue in point of fact, is to my mind too clearly proved to be disputed successfully. And I am quite satisfied that reliance was placed by the purchaser upon these representations, and that they influenced his judgment in making the purchase.

Whether known to the vendor to be untrue, or not, the misrepresentation was of something material, constituting an inducement to the purchaser, and in which he placed confidence, and was misled to his injury. These afford, according to the authorities, good ground of relief. 1 *Story's Equity, sections* 193, 194, 195, 197.

It has been urged, however, in this case, that, especially with reference to the appraisement of the negroes, the means of information were equally accessible to both parties, and that it was the folly of the purchaser not to look at the record and inform himself.

But the rule, as laid down by Chancellor Kent, vol. 2, sec. 39, page 484, and to which the commendation of Mr. Justice Story gives additional weight, appears to be, that though the means of correct information be equally open to both parties, yet, if either of them does or says anything, tending to impose upon the other, and he is imposed upon to his injury, the contract will not be allowed to stand.

Being of opinion, therefore, in this case, that the misrepresentation, whether known to be false or not, was of matter material to the contract, and upon which the purchaser relied, and by which he was misled to his injury, the sale must be rescinded, unless the purchaser since the sale has done, or forborne to do, some act essential to the assertion of his rights, or unless he is attempting to vindicate them in the wrong forum.

The rule as laid down in the books is, that where goods are discovered not to answer the order given for them, or to be unsound, the purchaser ought in a reasonable time to return them to the vendor, or to give him notice to take them back, and thereby rescind the contract, or he will be presumed to acquiesce in their quality.   And in the case of a breach of warranty, he may sue upon it without returning the goods; or rescind the contract by returning them, or the offer to return them in a reasonable time, so that the seller is placed in *statu quo ;* and sue for, and recover back the purchase money, in an action for money had and received. 2 *Kent,* 480; *Franklin and Armfield* vs. *Long,* 7 *G. & J.,* 407.

What is a reasonable time, within which the purchaser must rescind the contract, by a return of, or offer to return, the thing purchased, does not appear to be stated in the books.   The time, however, is to be computed from the period when the unsoundness of the chattel is discovered, and not from the date of the contract.

The bill in the case alleges, that so soon as the purchaser discovered the slaves to be unsound, that is, about one month after the sale, and before the death of the infant, he complained thereof to the vendor, John Mitchell, and required him to cancel the sale and take back the negroes, and return the consideration which had been paid for them, which he refused to do.

The proof upon this point is, that in or about one month after the sale; that is, about the 1st of June, 1848, the complainant went to the defendant, John Mitchell, to get him to take the negroes back, which the defendant said he could not do—the court would not allow him.   Afterwards, on or about the 20th of September, 1848, the complainant again went to the same

party to get him to take them back. The first offer to return the negroes, was before the death of the infant, who died in July of the same year.

There is, to be sure, some contradictory proof on this point, but the evidence of a witness affirming that he heard a statement made in a conversation between parties, cannot well be overthrown by proof that another witness was present, who did not hear the same thing. The witness who proved the fact in this case, stands altogether free from suspicion, and is unimpeached as to veracity ; and without intending to cast any discredit upon the witness who says he did not hear the remarks, and who I am well assured, did not hear them, I am satisfied that they were made, and that such prior offer was made. The answer of the defendant, John Mitchell, also denies the prior offer to return the negroes, but I am persuaded Mr. Mitchell must have forgotten the fact at the time his answer was prepared.

The presumptions in favor of the statement of the witness Gantt upon this point are so strong, that I considered it my duty to give credence to it; and hence, I assume, that about one month from the date of the purchase, the complainant did offer to return the negroes, and cancel the contract of sale ; and the question then is, whether this offer is sufficient to enable the court to vacate the sale, and restore the parties to their original condition.

It cannot, I think, be maintained, that the offer to return the negroes within the month, was not within a reasonable time ; neither, I presume, can it well be contended, that the purchaser is under an obligation to institute his action immediately after the vendor refuses to take the property back and refund the money. An offer to return the chattels in a reasonable time on breach of warranty, is equivalent in its effect upon the remedy to an offer accepted by the seller, and, therefore, assuming in this case, that the offer was made in June, 1848, I am to treat the case as if the offer had been accepted, and the negroes actually taken back by the vendor. If such had been done, there can be no doubt that the complainant would not have lost his remedy, by forbearing to resort to legal proceedings, until Oc-

tober of the same year, when this bill was filed. *Thornton* vs. *Wynn*, 12 *Wheat.*, 183.

At the time this offer was made, all the negroes were living, and if it had been accepted by the defendant, the parties would have been placed in *statu quo*. That the infant has since died, and that they cannot to that extent be placed in the same situation, is the defendant's own fault, of which, of course, he cannot complain.

That the complainant repeated the offer in the presence of a witness in September, 1848, the rights of third parties not having intervened, and nothing more having been done by him than simply keeping possession of the property, cannot, I think, impair or take away his rights. And, therefore, if he had the right to come into this court for redress, that right remains now in full force and effect.

It has been said, and the assertion has received the sanction of some of the most eminent judges known to any age, that fraud and damage coupled together will entitle the injured party to relief in any court of justice. And it was observed by Lord Eldon, in *Evans* vs. *Bicknell*, 6 *Ves.*, 182, 183, "that if a representation is made to another, going to deal in a matter of interest upon the faith of that representation, the former shall make the representation good, if he knew that representation to be false ; and that if there was a jurisdiction at law upon the doctrine, there was a concurrent jurisdiction in equity." The observation here is, if the party making the representation "knew it to be false," but upon the principle of the decision in *Joyce and wife* vs. *Taylor*, before referred to, the party will be equally bound by his representation, whether he knew it to be false or not, provided the other party believed in its truth, and, if it is false, is deceived by it. For, as Mr. Justice Story says, "the affirmation of what one does not know or believe to be true, is equally in morals and law as unjustifiable, as the affirmation of what one knows to be positively false." 1 *Story's Eq.*, sec., 193.

Now, it may very well be, that the defendant, John Mitchell, did not know what was the condition of those negroes with reference to their health. Indeed, one of his own witnesses

says, that when interrogated by the complainant upon that subject, he said "he knew very little about them," and referring him to another party for information, said, "he" (the complainant) "must examine for himself."

The same statement is repeated in the answer, in which the defendant says, he expressly told the complainant "he knew very little of them, and that he had rarely seen them." The answer contains a positive denial that the defendant gave any assurances or made any statements touching the soundness or health of the negroes—and yet there is in it an unequivocal assertion, that "the negroes were sound and healthful at the time of the sale, and were worth the sum of thirteen hundred dollars."

It is not easy to reconcile this positive declaration of the health and value of the negroes, in the answer, with the statement that he knew very little of them and had rarely seen them ; but it leads one strongly to believe that the defendant did incautiously venture to make statements at the time of the sale, respecting their soundness, without having the requisite information upon the subject ; and when to this presumption, fairly, as I think, arising upon what he says in his answer, is added the proof offered upon this point by the complainant, it seems to me that no reasonable doubt can be entertained in regard to it.

Here, then, is a case in which the complainant has been induced to purchase a family of incurably diseased slaves, upon representations made to him by the vendor, that they were sound and healthy ; and for a price fully equal to their value if the representation had been true. That he confided in, and was misled by these representations to a certain extent, I have no doubt ; and whether they were made with knowledge of their untruth, and with intent to defraud, or whether the vendor, without proper consideration, ventured to make them, without knowing whether they were or were not true, is immaterial.

The title of the purchaser to relief in this court, upon either alternative, is equally perfect, as is abundantly established by the authorities which have been referred to, and by many others

which could readily be found. *Daniel* vs. *Mitchell*, 1 *Story*, *C. C.*, 172 ; *Ainsley* vs. *Medlycot*, 9 *Ves.*, 21, *note a.*

The principle appears to be, that in a case of misrepresentation of facts, though inadvertently made, by mutual mistake of parties, or by mistake of either one of them, if the other has been prejudiced thereby, a court of equity will set it aside and declare it a nullity.

The jurisdiction of the court is supposed to be clearly established by the cases of *Evans* vs. *Bicknell*, 6 *Vesey*, 174 ; *Burrowes* vs. *Lock*, 10 *Vesey*, 470 ; *Bacon* vs. *Bronson*, 7 *Johns. Ch. Rep.*, 201.

It has been urged that this case is not unlike the case of Albert and wife vs. The Savings Bank of Baltimore, recently decided by this court, and referred to in the argument. It seems to me, however, to be totally dissimilar.

That was a case in which the bank, contrary to the provisions of its charter, had loaned a sum of money to one of its directors. The contract, though forbidden by its charter, was fairly and *bona fide* entered into, without the slightest taint of fraud or misrepresentation affecting its morality. The money loaned by the bank to the director, had been enjoyed by him, and not being paid at the time stipulated, the bank sold the securities held by it in pledge, and reimbursed itself. There could be no pretence, it seemed to me, *ex æquo et bono*, to compel the bank to pay back this money, either to the party who borrowed it or to any one else. Though the bank could not have recovered the money from the borrower, because of the legal inhibition to make the loan, yet still in *foro conscientiæ*, it was due, and being paid, no court of justice would lend its aid to compel its return. It would be repugnant to the plainest principles of justice.

But in this case, though the contract has been performed by the delivery of the property and payment of the consideration, yet, as its performance was the result of imposition, whether designed or not, practiced upon the purchaser, is immaterial— the court will rescind it, and place the parties in their original situation. In all the cases in which the contract has been re-

scinded, either by the act of the party or the decree of the court, the property had been delivered and the consideration paid. Otherwise the court in a great majority of cases, would be powerless to afford relief when the object of the fraud had been accomplished.

It has been supposed, that this being a sale of personal estate, the remedy should have been sought in a court of law. But the cases which have been cited, show that, at least, this court has concurrent jurisdiction in all cases of fraud and damage, And in the case of *Durell* vs. *Haley*, 1 *Paige*, 492, the Court of Chancery did order the restoration of goods to the complainant upon the ground of fraud.

In the case now under consideration, the remedy at law upon a recision of the contract, and an action to recover back the purchase money, would not be free from difficulty and embarrassment. The appropriate action, when the contract is rescinded by the purchaser, by returning or offering to return the article purchased in a reasonable time, is for money had and received, but, as in the present case, the negroes were not paid for in money, and as it does not now appear whether the money has been received on the securities assigned, it may, at least, be doubted whether a *count* for money had and received, could be maintained.

But I am of opinion that this court has jurisdiction ; and, upon the grounds already stated, shall pass a decree cancelling the contract of sale, directing a restoration of the slaves to the vendors, and a return to the complainant of the consideration paid for them, and for costs against the defendants.

Something was said about a provision in the decree for an account of the hires and profits of the negroes, and other matters connected with, and affecting the equities of the parties. But the pleadings do not make a case which will authorize such a decree.

All that I can do upon this bill, is to rescind the contract in *toto*, and put the parties, as far as practicable, in *statu quo*.

[An appeal has been taken from this decree, and is still depending.]